UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

STEPHEN H. WILLS,                    )
                                     )
            Plaintiff,               )
                                     )
    vs.                              )        Case No. 2:09CV00053 AGF
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
Administration,                      )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Steven Wills' application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  For

the reasons set forth below, the decision of the Commissioner shall be reversed and this

case shall be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. §

405(g) for further proceedings consistent with this Memorandum and Order.

Plaintiff, who was born on March 11, 1965, previously filed for disability

insurance benefits on December 19, 2003, alleging a disability onset date of January 31,

2003.  This application was denied on September 20, 2004, and review was denied by the

Appeals Council of the Social Security Administration on January 13, 2005.  It is

administratively final and res judicata.  Plaintiff again filed for benefits on December 13,

2006, due to damage to his leg, hip and arm from an ATV accident, and seizures and

memory problems, and thereafter amended his application to allege a disability onset date

of September 21, 2004, at age 39. (Tr. 9.) After Plaintiff's current application was denied at the initial administrative level, he requested a hearing before an Administrative Law Judge ("ALJ") and such hearing was held on December 18, 2008. By decision dated June 2, 2009, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work with additional non-exertional limitations for jobs available in the national economy. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on September 4, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence in the record as a whole because the ALJ failed to give proper weight to the July 16, 2004 opinion of Plaintiff's primary care physician, Julie D. Stansfield, M.D., and the July 16, 2004 opinion of Plaintiff's treating physician, Dr. Albert Snedden.

## BACKGROUND

### Work History and Application Forms

Plaintiff worked full-time as an electrician earning $16 per hour from 1987 to 1996. He also worked full-time as an injection molding supervisor earning $20 per hour from 1990 to 2003. (Tr. 122.) His job as an injection molding supervisor required him each day to walk for three and a half hours; stand for three and a half hours; sit for one hour; climb for two hours; stoop for two hours; kneel for two hours, crouch for two hours; crawl for half an hour; handle, grab or grasp big objects for two hours; reach for two hours; and write, type or handle small objects for two hours. (Tr. 122.) Plaintiff

reported that he "was constantly lifting and carrying" objects for varying distances, most of which weighed twenty-five pounds. The heaviest weight he lifted was 100 pounds or more. (Tr. 122-23.)

Plaintiff's earnings records indicate that he earned $3,132 in 1987 and, between 1988 and 1990, he earned between $8,858 and $12,384 annually. Between 1991 and 1995, Plaintiff's earnings rose from $20,710 to $35,449 annually. In 1996, Plaintiff earned $27,780, and he earned $33,212 in 1997. Between 1998 and 2002, Plaintiff earned between $44,394 and $49,836 annually. In 2003, Plaintiff earned $8,834. (Tr. 112.)

## Medical History

The records disclose that in mid-June 1996, Plaintiff was in an ATV accident, in which he sustained a partial amputation of the right thumb and a leg fracture. (Tr. 144-45.) On July 2, 1996, Plaintiff was examined by Jeffery Anglen, M.D., at the University of Missouri Hospital and Clinics ("UMHC"). Dr. Anglen noted that Plaintiff had suffered a femoral fracture and accompanying femoral artery injury. (Tr. 144.) Plaintiff also underwent a radiology consultation with Gina K. Chatfield, M.D., who noted vascular clips in the soft tissues of Plaintiff's thigh, intramedullary rods in his right femur, and screws in his distal femur. Dr. Chatfield noted that the most distant screw appeared to extend into the soft tissues anteriorly. (Tr. 420.)

On July 8, 1996, Plaintiff underwent surgery on his right thumb. The surgery was performed by Charles L. Puckett, M.D., and Stefan Craig, M.D., at UMHC. Dr. Craig

noted that Plaintiff had "sustained a partial amputation of the left thumb[1] at the metaphanlangeal joint" three and a half weeks earlier in a motor vehicle accident. (Tr. 145.) The surgery completed the partial amputation of his thumb by using "coverage . . . from the chest wall," and was without complications. (Tr. 145-46.)

Plaintiff returned to Dr. Anglen on July 11, 1996, who reported that Plaintiff did not have a fever, there was no evidence of infection, and the graft site looked good. However, Dr. Anglen noted that Plaintiff complained that his knee was swollen and Plaintiff had a prominent palpable screw in his distal femur. After discussing changing or removing the screw, Dr. Anglen decided to "hold off" on physical therapy on the knee. (Tr. 419.)

On July 13, 1996, Plaintiff visited the emergency room at UMHC because of an infection at the site of his amputation. (Tr. 148.) He was advised to continue the medications he was taking, to keep his hand elevated, and to keep the amputation site clean. He was also directed to return for a follow-up on July 15th. (Tr. 149.)

Plaintiff was seen by Jack R. Hurov, PSPT, Ph.D., on July 16, 1996, for an initial physical therapy evaluation. Dr. Hurov noted that Plaintiff demonstrated decreased active motion of his right elbow and shoulder and would benefit from at-home motion exercises. (Tr. 158-59.)

---

[1] The reference to Plaintiff's left thumb is likely an error, and should have referenced his right thumb. The subsequent records, including those by Dr.'s Puckett and Craig, reference Plaintiff's right thumb.

Plaintiff visited Dr. Anglen again on July 18, 1996, at UMHC Orthopaedic Surgery Center. Dr. Anglen noted that Plaintiff's right leg was "nonweightbearing," and that Plaintiff noted, for the first time, right shoulder weakness, as well as "some pain" in his right hip and buttock. Plaintiff's amputation site appeared to be healing well, but he seemed also to "have a picture of a neurologic impairment in the axillary nerve." Dr. Anglen instructed Plaintiff to begin physical therapy for his knee, shoulder and back. (Tr. 150.) Plaintiff also underwent a radiology consultation by Clive Levine, M.D., who noted that Plaintiff's comminuted fracture of the distal right femoral shaft was redemonstrated, and that the intramedullary rod remained in place. He further noted evidence of progressive healing, and that the surgical hardware was intact. (Tr. 418.)

On July 23, 1996, Plaintiff was seen again by Wendy Nall, PT, for a physical therapy initial evaluation. Ms. Nall noted that Plaintiff had been diagnosed with a status post right femur fracture, right shoulder weakness, and lower back pain. Dr. Anglen's orders for Plaintiff included strength and ambulation training for his right lower extremity, strength and range of motion exercises for his right upper extremity, and strengthening and other modalities for his right lower back and buttock pain. Plaintiff reported constant pain in his leg and back, and rated his pain between five and seven on a ten point scale. (Tr. 151.) Ms. Nall noted that Plaintiff was independent but slow, and had required some assistance from his wife to make it to his appointment. She noted that Plaintiff's gait had been significantly affected by his injury and he showed significant decreases in range of motion. (Tr. 153.) Ms. Nall ordered Plaintiff to continue receiving physical therapy three times per week. (Tr. 154.) Plaintiff's treatment plan included

strengthening and muscle re-education through therapeutic exercises, as well as biofeedback and a home exercise program. (Tr. 156.)

Plaintiff returned to Dr. Anglen on August 5, 1996, because his physical therapist noted that Plaintiff had increased swelling from his right knee down to his ankle. Plaintiff denied having pain in his leg, but noted pain in his right hip. Dr. Anglen felt the increased swelling was probably due to increased activity, and recommended rest. (Tr. 416.)

On August 13, 1996, Plaintiff was seen again by Dr. Anglen after complaining of pain from a prominent distal interlock screw, right "SI" joint area back pain, some pain in the knee and thigh, and persisting weakness and pain in his shoulder. Dr. Anglen noted that Plaintiff had been weightbearing without too much difficulty using a cane. He also prescribed Elavil for Plaintiff's nerve symptoms in his leg. (Tr. 157, 414-15.) Plaintiff also had a radiology consultation with Dr. Levine, who, regarding Plaintiff's femur, noted that the comminuted fracture of the right distal femoral shaft was redemonstrated, the intramedullary rod remained in place, there was evidence of progressive healing, and the surgical hardware was intact. Regarding Plaintiff's pelvis, Dr. Levine noted that the intramedullary rod was redemonstrated in the proximal portion of the right femur, there were no bony abnormalities evident, the femoral heads were well positioned in the acetabulae, and the SI joints were patent. (Tr. 413.)

On August 16, 1996, Plaintiff underwent an arthrography on his right shoulder with J.R. Cope, M.D. Dr. Cope noted that Plaintiff's gleno-humeral joint was easily entered with an 18 gauge spinal needle and that he injected approximately 13 cc of

Hypaque 60.[2] Dr. Cope further noted that the synovium of the gleno-humeral joint appeared normal, there was filling of the bicipital groove, and there was no filling of the subacromial or subdeltoid bursae. His overall impression was that it was a "normal study" and there was no evidence of a rotator cuff tear. (Tr. 412.)

On August 20, 1996, Dr. Anglen and Frank Moussa, M.D., removed Plaintiff's distal femoral interlocked screw hardware. Dr. Anglen noted that the procedure went without complications. (Tr. 410-11.)

On September 2, 1996, Plaintiff went to the UMHC Emergency Center due to "recurrent pain" in his femur and had his Percocet prescription refilled. (Tr. 162-63.)

Plaintiff returned to Dr. Anglen on September 10, 1996 for a follow-up visit. His pain was noted to be "located diffusely in the lower back and right buttock," which occasionally shot to his foot. Plaintiff also reported "decreased sensation and numbness and tingling and pins and needles, in the whole leg," which Dr. Anglen attributed to Plaintiff's vascular injury. (Tr. 408-09.) Plaintiff was also seen by Hollis Thomas, M.D., for a lumbar spine examination. Dr. Thomas noted that Plaintiff had a normal lumbar spine. (Tr. 407.)

On October 9, 1996, Plaintiff underwent Doppler Color Flow Imaging of his right leg, performed by Donald P. Spadone, M.D. Dr. Spadone noted that the imaging showed normal flow within the repaired superficial femoral artery. (Tr. 166-68.)

---

[2] Hypaque-M 60 is an ionic radiopaque contrast agent used in body imaging. <u>See</u> Diatrizoates (Systematic) at <u>http://www.drugs.com/mmx/hypaque-meglumine-60.html</u>.

Plaintiff was seen by Dr. Puckett on October 11, 1996, for examination prior to undergoing a partial thumb reconstruction. Dr. Puckett noted that Plaintiff was taking Percocet at admission. (Tr. 170-71.)

On October 28, 1996, Plaintiff underwent thumb reconstruction, which was performed by Dr. Puckett, Steve Hughes, M.D., and Geoffrey Yule, M.D. The operation consisted of an iliac crest bone grafting from the left hip to the right thumb proximal phalanx remnant, the defatting of the right thumb flap, and Z-plasty web space deepening of the right thumb web space. Dr. Yule noted that Plaintiff "tolerated the procedure well." (Tr. 172-74.)

Plaintiff returned for a post-surgery follow-up on November 1, 1996. He was seen by Dr. Puckett and Joseph Grzeskiewicz, M.D. Dr. Grzeskiewicz noted that Plaintiff continued to have excessive pain due to the surgery, but was doing "quite well." Dr. Grzeskiewicz also refilled Plaintiff's Percocet prescription. (Tr. 175.) Plaintiff returned for an additional follow-up appointment on November 5, 1996, and was seen by Dr. Puckett and Stefan B. Craig, M.D. Dr. Craig noted that Plaintiff was "healing as expected." (Tr. 176.) Plaintiff was seen once more by Dr. Puckett and Dr. Craig on November 5, 1996. Dr. Craig noted that there was no evidence of infection and Plaintiff's sutures remained intact. Moreover, the graft donor site appeared to be "healing well." (Tr. 177.)

On November 26, 1996, Plaintiff was seen by Dr. Puckett and Dr. Yule complaining of pain. Dr. Yule noted his concern about Plaintiff's use of pain medicines, having "received a letter from a drug monitoring organization that [Plaintiff] had received

numerous prescriptions from numerous practitioners for narcotics." Dr. Yule recommended non-narcotic pain relief measures. (Tr. 169.)

On December 5, 1996, Plaintiff visited Dr. Anglen seeking a full work release to go back to work as a maintenance electrician. Dr. Anglen noted that Plaintiff was "doing reasonably well." Plaintiff still experienced some pain in his leg and buttock, decreased sensation, and decreased mobility. Dr. Anglen noted that review of Plaintiff's x-ray showed a healed femur, and therefore he granted Plaintiff a release to go back to full work. (Tr. 404-06.) Plaintiff's radiology consultation was with Dr. Cope, who noted that Plaintiff's femur fracture showed a good deal of interval repair and was unchanged in position. (Tr. 405.)

Plaintiff saw Dr. Puckett on December 10, 1996 regarding his reconstructed thumb. Dr. Puckett removed Plaintiff's K-wire pin, and noted that the bone graft appeared to be doing well. Plaintiff denied any pain. (Tr. 403.) Later that day, Plaintiff had a radiology consultation for his fingers with Dr. Hollis Thomas, who noted that he saw "little interval change" from Plaintiff's November 5, 1996 exam. (Tr. 181.)

On January 15, 1997, Plaintiff was admitted to UMHC for a "Littler neurovascular island flap transfer from the ulnar aspect of the fourth digit to the [right] thumb." Drs. Puckett and Hughes performed the surgery and noted that the flap "did well." Plaintiff was discharged on January 17, 1997, and prescribed Erythromycin and Percocet upon discharge. (Tr. 217-23.)

Plaintiff returned to the UMHC for a follow-up with Dr. Puckett on January 21, 1997. Dr. Puckett noted that the flap appeared pink and healthy, the sutures were in

place, and the signs of infection and swelling had decreased. (Tr. 400.) Plaintiff returned to Dr. Puckett on February 4, 1997, and Dr. Puckett noted that Plaintiff was "healing well." (Tr. 399.) At a follow-up appointment on February 14, 1997, Dr. Puckett noted that the flap was healing well and functional, and that Plaintiff had sensation in his thumb flap. He ordered Plaintiff to return in three to four weeks for reevaluation and a possible return to Plaintiff's full work load. (Tr. 398.) Dr. Puckett saw Plaintiff again on March 14, 1997, noting that Plaintiff was doing well, and could return to work full duty. He also prescribed hand therapy for Plaintiff's ring finger. (Tr. 397.)

On June 2, 1997, Plaintiff visited Jack R. Hurov, MSPT, Ph.D., for hand therapy, complaining of decreased range of motion in his right thumb, decreased sensation of his right thumb, and decreased range of motion of his right ring finger. (Tr. 394.) Dr. Hurov noted that Plaintiff demonstrated passively correctable IP joint flexion contractures of his right ring finger, and that Plaintiff continued to protectively position his right residual thumb, preferring instead to use his right index and long fingers for prehension. Dr. Hurov also noted that there did not appear to be additional need for outpatient follow-up of hand therapy. (Tr. 395-96.)

On June 12, 1997, Plaintiff was seen by Dr. Anglen for "continued hip and knee pain." Dr. Anglen noted that Plaintiff was working as a maintenance electrician, but continued to have some pain and disability and was unable to do his activities "that he was at before." Dr. Anglen also noted that Plaintiff's thigh wounds were well healed with no sign of infection, he could not perform a complete squat on the right side, and he had decreased sensation with paresthesias globally below the knee. Additionally,

Plaintiff had good strength in his shoulder in abduction to about 120 degrees, but was quite weak in external rotation. Plaintiff reported that he could not afford hardware removal at the present time, so Dr. Anglen referred him to a pain clinic for evaluation of his chronic pain symptoms. (Tr. 393.)

Plaintiff visited Dr. Spadone at the UMHC on September 17, 1997 for a color flow duplex ultrasound in both traverse and sagittal planes of his right leg. Dr. Spadone noted that the by-pass graft was patent with no evidence of significant stenosis, and that the proximal and distal native vessels were normal. (Tr. 227.)

On September 24, 1997, Plaintiff received a radiology consultation from Harry Griffiths, M.D. Dr. Griffiths examined Plaintiff's chest and noted that Plaintiff's heart and diaphragms were normal, his lung fields were clear, and his chest was normal. (Tr. 228.)

Plaintiff returned to the UMHC on November 14, 1997, and was seen by William E. Davis, M.D., in the Ear Nose and Throat clinic, regarding trouble sleeping. Dr. Davis performed a nasal endoscopy and flexible endoscopy, and noted that Plaintiff had probable sleep apnea, a deviated nasal septum, "maybe chronic sinusitis," and a poorly functioning left vocal cord. (Tr. 229-31.) A sleep study conducted by Pradeep Sahota, M.D., on November 17, 1997, revealed that Plaintiff's sleep was "mildly abnormal . . . because of underlying sleep efficiency of 85.9%." Dr. Sahota also noted a decrease in Plaintiff's Stage III, IV and REM sleep, possibly due to sleeping in a strange environment, but noted that there was not evidence of sleep apnea/hypopnea syndrome. (Tr. 232.) On January 6, 1998, Plaintiff was seen by Dr. Sahota and Sharat Ahluwalia,

M.D., at the UMHC Neurology Clinic. Dr. Sahota noted that Plaintiff was currently taking Xanax and Buspar, which Plaintiff reported "helps." Dr. Sahota referred Plaintiff for an evaluation by Dr. James Slaughter in Psychosomatic Medicine, and counseled Plaintiff regarding his diet and exercise. (Tr. 234-37.)

On March 2, 1999, Plaintiff was admitted to UMHC's Department of Internal Medicine having experienced emesis with a small amount of bright red blood. On March 3, 1999, Plaintiff underwent an Esophagogastroduodenoscopy with biopsy, performed by Sreeni Jonnalagadda, M.D. Dr. Jonnalagadda noted a large sliding hiatal hernia, reflux esophagitis, and blood that appeared to have come from esophageal ulcers. (Tr. 240.) Mitchell J. Rosenholtz, M.D., reviewed the biopsy slides and diagnosed Plaintiff with reflux esophagitis, and Barrett's esophagus, intestinal and gastric types. Upon review of the biopsy results, Dr. Jonnalagadda recommended that Plaintiff stay on Prilosec long-term. (Tr. 241-42, 244-45.) Because Plaintiff has some fever on presentation, Kendrick Davidson, M.D., performed a chest x-ray on Plaintiff, which showed no abnormalities. (Tr. 243-44.)

On September 23, 1999, Plaintiff was seen by Paul D. King, M.D., and "Dr. Agrawal," of the UMHC Gastroenterology Department. Dr. King noted that Plaintiff had Gastroesophageal Reflux Disease ("GERD") with Barrett's esophagus and a history of bleeding esophageal ulcers. Dr. King continued Plaintiff's Prilosec prescription and also prescribed Zantac. He also discussed the possibility of anti-reflux surgery with Plaintiff, but Plaintiff said it was too costly. (Tr. 246-47.)

On December 2, 1999, Plaintiff was seen by Kenneth L. Rall, M.D., for pain in his limb. Dr. Rall noted that Plaintiff's knee joint was mildly narrowed, which may have represented minimally increased degenerative disease. (Tr. 391.) Dr. Rall also examined Plaintiff's femur, and noted that the intramedullary rod in Plaintiff's femur was unchanged, the callus at the level of the fracture site was unchanged, and there was no evidence of loosening of the prosthesis. (Tr. 392.)

On February 24, 2000, Plaintiff was admitted to the UMHC Emergency Center complaining of chest pain. At discharge, his Prilosec prescription was increased, he was prescribed Tylenol for the pain, and he was ordered to return if the pain worsened. (Tr. 248-53.)

On October 2, 2000, Plaintiff visited his primary care physician, Julie D. Stansfield, M.D., complaining of a cough, some chest tightness, some popping in his right ear, tenderness in his neck, and significant stress. Dr. Stansfield prescribed him a Z-PAC, Flonase, and Allegra for his cough. She also gave him samples of Protonix for his esophogitis problems, and prescribed him Percocet for his chronic pain related to his past motor vehicle accident. (Tr. 384.)

On May 8, 2001, Plaintiff visited Dr. Stansfield for a routine follow-up, and also complained of a sore throat, right ear pain, and a rapid heart rate. Dr. Stansfield noted Plaintiff's vascular device/graft malfunction, anxiety, and reflux esophagitis had all deteriorated. She also prescribed Celexa, Nexium and Percocet. (Tr. 388-90.)

Plaintiff returned to Dr. Stansfield for a follow-up visit on May 22, 2001. Dr. Stansfield noted that Plaintiff's anxiety had improved and refilled his prescription for Percocet. (Tr. 385-87.)

Beginning in May 2001, Dr. Stansfield began consistently prescribing Plaintiff Percocet 5/325 pills. From September 2002 through February 2003, Dr. Stansfield wrote a total of seven 100-pill Percocet prescriptions at roughly one month intervals. At the end of February 2003, Dr. Stansfield wrote another prescription for Percocet, but the amount prescribed is unclear. From July 2003 through October 2003, Dr. Stansfield wrote a total of four 150-pill prescriptions for Percocet at roughly one month intervals. From February 2004 through April 2004, Dr. Stansfield wrote Plaintiff a total of four 150-pill Percocet prescriptions at roughly one month intervals. Finally, from August 2004 through October 2005, Dr. Stansfield wrote Plaintiff a total of sixteen 150-pill prescriptions for Percocet at roughly one month intervals, and one 75-pill prescription in November 2005. Thus, from September 2002 through November 2005, Dr. Stansfield's records indicate that Plaintiff was prescribed at least 3,675 pills of Percocet 5/325. (Tr. 264-343.)

In addition to the Percocet mentioned above, Dr. Stansfield prescribed Plaintiff several other medications. Dr. Stansfield's records indicate she saw him on a follow-up visit on June 12, 2001, and noting his anxiety, prescribed him Zoloft. (Tr. 382-83.) Plaintiff was seen again by Dr. Stansfield on September 30, 2002, where she noted his leg pain, elevated blood pressure, and reflux esophagitis, and prescribed him Nexium. (Tr. 341-43.) Dr. Stansfield saw Plaintiff on November 21, 2002, where she noted his elevated blood pressure and leg pain, and prescribed him Toprol. (Tr. 335-37.)

Plaintiff was examined by David Brummett, M.D., on December 16, 2002, at the Boone Hospital Center Department of Radiology in Columbia, Missouri.  Dr. Brummett noted that Plaintiff's right femur fracture appeared to be healed, and that the examination of his left hip was "unremarkable."  (Tr. 344-45.)

Plaintiff returned to Dr. Stansfield for a follow-up on his blood pressure on January 10, 2003.  Dr. Stansfield noted that Plaintiff had benign hypertension, hip pain, leg pain.  She stated that Plaintiff needed to stay off work because of his hip and leg pain, which had increased with a more difficult work week.  She also noted that Plaintiff was unable to physically climb ladders and crouch due to increased arthritic problems, was unable to stand and sit for long periods, and risked falling due to increased weakness.  (Tr. 329-31.)  On March 21, 2003, Dr. Stansfield again saw Plaintiff, and noted that he had hypertension, sleep disturbance, and limb pain.  She prescribed him Ambien to improve his sleep and decrease his blood pressure.  She also noted that he was "physically incapable of safely working in current environment that he describes as physically . . . demanding and dangerous."  (Tr. 322.)

On April 8, 2003, Plaintiff entered a Veterans Affairs substance abuse treatment program.  The initial assessment for this program was conducted by Michael Moore, Ph.D., a psychologist.  At the time of admission, Plaintiff's current substance usage was an eighteen-case of beer each day, and his most recent usage had been that day.  (Tr. 203.)  Plaintiff reported that he had been abusing alcohol for approximately the last five years, and his longest period of sobriety was a "couple of weeks" in 2000.  (Tr. 203-04.)  He also reported using marijuana.  (Tr. 204.)  He indicated that he did not need any

assistance walking, getting dressed, using the bathroom, bathing, eating, or taking medications on his own. He also did not have pain of any kind that would limit his participation in the program. (Tr. 205.) He reported experiencing chronic pain at a level of five or six on a ten point scale, and indicated that he took Percocet, but would not need it during the program. (Tr. 206-07.)

Following his initial assessment, Sandra Happ, R.N., reviewed Plaintiff's plan of care with Plaintiff, and noted that Plaintiff was admitted for detox. (Tr. 201-03.) Additionally, Farrukh Jawaid, a staff physician, took Plaintiff's history and performed a physical on Plaintiff. Dr. Jawaid noted that Plaintiff wanted to go through detox. (Tr. 199-201.)

On April 9, 2003, Plaintiff was to be admitted to the substance abuse program for alcohol dependence by John F. Patterson, M.D., a psychiatrist. Dr. Patterson noted that Plaintiff was intoxicated upon entering the program and had been detoxed prior to his admission. (Tr. 195-99.)

On April 10, 2003, Plaintiff participated in group therapy sessions led by social workers, including anger management training, a community meeting, a problem solving group, and a relaxation group. (Tr. 191-92.) That same day, Cheryl Peterson, a psychology technician, performed an assessment on Plaintiff and diagnosed Plaintiff with an Axis V (GAF) score of 55.[3] (Tr. 192-95.) On April 11, 2003, Plaintiff took part in

_____

[3]A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. GAF scores of 21-30 reflect behavior that is "considerably influenced" by delusions, hallucinations, serious impairment in

group therapy sessions led by staff psychologists or addiction therapists, including a community meeting, a twelve step education group, and a "Friday Process Group." (Tr. 190-91.) Plaintiff chose to terminate substance abuse treatment on April 16, 2003. (Tr. 187-89.)

On July 13, 2003, Plaintiff was seen by Samer Al-Shurieki, identified as a fellow. Plaintiff sought treatment for a rash, and Dr. Al-Shurieki prescribed metoprolol succinante and prednisone. He also noted that Plaintiff had a problem with alcohol dependence. (Tr. 184-85.)

On July 31, 2003, Plaintiff was seen by Dr. Stansfield, who noted that Plaintiff's benign hypertension, nausea, and vomiting were uncontrolled. (Tr. 318.) Plaintiff returned to Dr. Stansfield on September 17, 2003. Dr. Stansfield noted that Plaintiff's panic attacks had returned and his nausea and vomiting continued. She prescribed Zoloft and gave him Levaquin samples for a presumed urinary tract infection. (Tr. 313-14.) Dr. Stansfield saw Plaintiff again on November 24, 2003, noting that Plaintiff could hardly talk due to coughing, and complained of waking up in severe pain in his right hip. Dr. Stansfield diagnosed Plaintiff with bronchitis and prescribed him a nebulizer of Atroven, Avalox, and Ultram.(Tr. 306-08.)

---

communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

On October 1, 2003, Plaintiff was seen by Jon Mattson, D.O., at the Moberly Area Osteopathic Clinic. Plaintiff reported having problems with a hiatal hernia and Barrett's esophagus. (Tr. 376.) Dr. Mattson determined that Plaintiff suffered from right leg pain, right hip pain, right knee pain, hypertension that appeared to be controlled, GERD, a hiatal hernia, Barrett's esophagus, and alcohol abuse. Dr. Mattson also noted that he and his office staff noted the smell of alcohol on Plaintiff's breath, but that he did not appear to be intoxicated. Dr. Mattson noted that Plaintiff's right thumb stump appeared to be "fairly functional," and that Plaintiff was able to touch all four fingers with his thumb "stump." Plaintiff also had an antalgic gait favoring the right lower extremities, which Dr. Mattson noted suggested that Plaintiff was having difficulties with his hip and knee. When Dr. Mattson compared Plaintiff's right and left legs, he noted that Plaintiff had diminished strength in the right lower extremity, and Plaintiff's deep tender reflexes were diminished in the right lower extremity. Plaintiff reported that his Barrett's esophagus caused him a lot of pain, notwithstanding his medication. Dr. Mattson noted that Plaintiff's "lifestyle of heavy alcohol drinking is not a conducive lifestyle for somebody who has a hiatal hernia; gastroesophageal reflux disease and . . . Barrett's esophagus." Plaintiff also reported difficulty with sitting, standing, walking, lifting and carrying objects. Dr. Mattson did not observe Plaintiff having any difficulty with sitting, but noted that Plaintiff did have some difficulties with standing and walking, and although his lifting was not tested for safety reasons, Dr. Mattson noted that "if he was having difficulties with standing and walking, he would have difficulties with lifting objects in that position." Plaintiff has no difficulties with hearing or speaking, and demonstrated

"fairly good hand dexterity." Finally, Dr. Mattson indicated that he did not believe that Plaintiff would be able to be involved in the construction business because of the walking and lifting involved, but that Plaintiff probably was able to perform other tasks that would involve sitting, handling objects, hearing or speaking. (Tr. 376-79.)

On October 20, 2003, Leah Smith, a medical consultant, performed a Physical Residual Functional Capacity Assessment based upon Plaintiff's medical records. Ms. Smith indicated that Plaintiff could occasionally lift and/or carry 50 pounds, and could frequently lift and/or carry 25 pounds. Ms. Smith also noted that Plaintiff could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and could sit (with normal breaks) for a total of about six hours in an eight-hour workday. Additionally, Ms. Smith indicated that he could push and/or pull without limitation, other than as noted for lifting and/or carrying. Ms. Smith noted that with regard to Plaintiff's postural limitations, he could climb ramps and stairs frequently, and ladders, ropes and scaffolds occasionally. In addition, he could balance, stoop, kneel, crouch, and crawl frequently. She assessed no limitation on Plaintiff's ability to manipulate, and noted that Plaintiff's "thumb amputation with only a stump remaining [is] fairly functional." She also assessed Plaintiff as having no visual, communicative, or environmental limitations. Ms. Smith noted that while Plaintiff alleged disability "due to previous injuries to his right leg, hip and arm, uncontrolled blood pressure and Barrett's esophagus," his physical findings were within normal limits except for his right thumb amputation and some residual weakness of the right leg, his blood pressure was 136/90 and was controlled by current treatment, and he had been treated for Barrett's esophagus, but was noted to be

non-compliant with treatment. Ms. Smith concluded that the "MER establishes a medically determinable impairment and [Plaintiff's] symptoms are deemed to be partially credible but his limitations do not prevent him from working." (Tr. 367-75.)

On October 26, 2003, Paul Stuve, Ph.D., a psychologist, conducted a Psychiatric Review Technique based upon Plaintiff's medical records. Dr. Stuve concluded that Plaintiff suffered from no medically determinable impairment. He noted that Plaintiff did not have a current psychiatric diagnosis, and the last mention of an anxiety diagnosis was in a May 2001 progress note. While Plaintiff reported that he continued to take Zoloft, there was no current mention of such in his medical records. (Tr. 351-63.)

On January 9, 2004, Dr. Stansfield saw Plaintiff regarding anxiety Plaintiff was feeling from dealing with his divorce and prescribed him Xanax. (Tr. 304.)

On January 12, 2004, Plaintiff was seen by Eric Lange, PT, at the Phelps County Regional Medical Center for treatment in connection with an ankle injury he suffered at work on January 5, 2004. (Tr. 213-14.)

On March 12, 2004, Plaintiff failed to show up for an appointment with Dr. Stansfield. (Tr. 300.) Thereafter, on April 27, 2004, Dr. Stansfield noted that Plaintiff "reek[ed] of alcohol" when picking up his prescription from her receptionist. (Tr. 295.)

On September 16, 2004, Plaintiff was seen by Dr. Stansfield, complaining of sinus congestion. Dr. Stansfield noted Plaintiff's benign hypertension. Her notes reflect that Plaintiff consumed seven to eight drinks a day, was not aware that was a problem, and admitted to "already having 2 alcoholic beverages." She discussed his addictive personality problems, advised him that he had to stop drinking alcohol, and noted that the

alcohol "may have a lot to do with his vomiting." She noted that he was currently being treated with Xanax, Ultram, Avelox, Zoloft, Toprol, Nexium, and Percocet. She prescribed Zithromax for his sinusitis and discussed the dangers of alcohol with him, telling him that he must stop. (Tr. 291-92.) On July 27, 2005, Dr. Stansfield noted that she would like to taper Plaintiff's Percocet use to lower levels. (Tr. 274.) On September 2, 2005, Dr. Stansfield prescribed Plaintiff Neurontin for his chronic pain. (Tr. 272.) Dr. Stansfield saw him again on September 9, 2005, where she noted his esophageal reflux and alcoholism. She discussed withdrawal, the need for slow tapering, and advised Plaintiff that alcohol withdrawal could be deadly. She also advised him that he would need to taper his Percocet as well. (Tr. 268-69.) She prescribed Plaintiff Omperazole, Valium and Reglan. (Tr. 265, 269.)

On November 28, 2005, Plaintiff was treated at the UMHC Emergency Center for an abscess in his sacral region. His abscess was incised and drained, he was prescribed Keflex and Percocet, and he was discharged the same day. (Tr. 254-60.)

On October 11, 2006, Plaintiff was seen at the Phelps County Regional Medical Center by S. Pecos Coble, D.O., for sleep apnea. (Tr. 209.) Dr. Coble ordered a polysonogram of Plaintiff, after which he noted that Plaintiff did not meet the criteria for a diagnosis of obstructive sleep apnea, but noted loud snoring, mild oxygen desaturation, severe premature ventricular contractions, moderate periodic limb movement disorder, delayed sleep onset, reduced sleep efficiency, a history of insomnia, and a history of ventricular contractions in the past. Dr. Coble recommended that Plaintiff see a

cardiologist and lose weight, and noted that a dental appliance and an ear, nose, and throat consultation may be helpful for treating his snoring. (Tr. 210-11.)

A "Problem List" prepared on December 19, 2006 by Dr. Stansfield indicated Plaintiff suffered from alcoholism (with addictive personality), anxiety, Barrett's esophagus, a femoral artery bypass, a fractured femur, GERD, hip pain, hypertension, limb pain, nausea and vomiting, osteoarthritis, sleep disturbance, and a traumatic avulsion thumb. She also noted that Plaintiff was currently taking Nexium, Percocet, Toprol, Ultram, Valium, and Xanax. (Tr. 262-64.)

Plaintiff was again admitted to a Veterans' Affairs substance abuse treatment program for his alcohol dependence on September 3, 2007, and was discharged on September 5, 2007. (Tr. 426.) Upon admission, Cheryl Hemme, M.D., diagnosed Plaintiff with a GAF of either 20 or 45,[4] and upon discharge Dr. Hemme diagnosed his GAF of 60. Plaintiff reported that he was sick of being an alcoholic and requested detox. He admitted to drinking a minimum of a case of beer per day. (Tr. 426, 447.) He also noted that he had been suffering from anxiety and poor sleep and energy. Dr. Hemme noted that Plaintiff suffered from alcohol dependence, a thumb amputation, hypertension, allergic rhinitis, chronic pain, aftercare for healing the traumatic fracture of his leg, and Barrett's esophagus. She also noted that Plaintiff had chronic alcohol dependence, did not smoke cigarettes, and occasionally "dabbled with marijuana." (Tr. 427, 448) Plaintiff's labs also tested positive for cannabis. (Tr. 429) Dr. Hemme assessed Plaintiff

_____

[4] The records conflict on Plaintiff's GAF upon admission. It is reported as 20 at Tr. 426 and as 45 at Tr. 447.

as having a chronic history of alcohol dependence, requesting detox, endorsing some symptoms of PTSD, and having post-traumatic chronic right leg pain. (Tr. 429, 449.)

Robert Rucker, a readjustment counsel therapist, met with Plaintiff on September 4, 2007, and indicated that Plaintiff's mood was "anxious with congruent affect," his "judgment was fair," and his "[t]hought process was logical, linear, and goal-directed." (Tr. 444.) Mr. Rucker diagnosed Plaintiff with a GAF of 45. (Tr. 446.) Plaintiff reported to Mr. Rucker that he last drank "yesterday," and had last used marijuana about one week prior. He also indicated that his goal was "detoxification of alcohol" which he "report[ed] as already been completed." Mr. Rucker noted that Plaintiff was "100% disabled, and unemployable." (Tr. 445.) He also noted that Plaintiff reported that if an Alcohol Treatment Program bed was not available by September 5, 2007, he desired to leave the hospital with a scheduled date of return. Plaintiff stated that he would not consume alcohol in the interim, but Mr. Rucker considered him at risk for continued drinking if he left the hospital, and would require further detox prior to being re-admitted to Alcohol Treatment Program. (Tr. 446.)

On September 5, 2007, Plaintiff was assessed by Dr. Hemme as part of his transition into a twenty one day substance abuse treatment program. Dr. Hemme noted that Plaintiff had received individual therapy, group therapy, recreation therapy, a nursing education class, a stress management class, and tobacco education. She diagnosed him with a GAF of 65. (Tr. 442-43.) She also noted that Plaintiff was "motivated for treatment and wants to stop drinking," and that "[h]is pain is a trigger for continued drinking." (Tr. 444.)

On September 12, 2007, records by Craig A. Morton, a workforce development representative, indicate that he met with Plaintiff, who had started to search for a job and hoped to find gainful employment. (Tr. 441-42.)

On September 14, 2007, Plaintiff was seen again by Mr. Rucker, who noted among Plaintiff's active problems, his alcohol dependence, nicotine dependence, chronic pain, and moderate impairment of his sleep. (Tr. 433-34.) Plaintiff reported a history of occasional panic attacks, memory problems, and passive suicidal thoughts, and indicated that his longest period of sobriety had been "[a] couple of weeks." (Tr. 435-36.) Mr. Rucker noted that Plaintiff "appear[ed] to be minimizing the negative impact of alcohol on his life and functioning." (Tr. 441.)

On September 19, 2007, Plaintiff chose to leave the substance abuse treatment program. Mr. Rucker noted that "[u]pon morning room-check, [the] nurse reported that [Plaintiff] had apparently packed his belongings and departed the program." (Tr. 431.) At discharge, Mr. Rucker diagnosed Plaintiff with a GAF of 45, and considered his "[p]rognosis for remaining sober from alcohol [to be] poor." (Tr. 432.)

On December 20, 2007, Plaintiff visited Dr. Albert Snedden complaining of pain in his right leg. (Tr. 469-73.) Dr. Snedden diagnosed Plaintiff with severe chronic pain in his right leg, a remote compound fracture, GERD, Barrett's esophagus, hypertension, and "component of neuropathic pain." Dr. Snedden discontinued Plaintiff's morphine and prescribed oxycodone in its place, increased Plaintiff's dosing of gabapentin, and added a "small dose" of HCTZ/Lisinopril. (Tr. 472.)

On August 17, 2008, Plaintiff was seen in the emergency room by Pamela Downing, M.D.  He complained of dizziness, and numbness and weakness on his right side.  (Tr. 463.)  Dr. Downing noted that Plaintiff used alcohol and tobacco, and that he tested positive for having used marijuana.  (Tr. 464-65.)  Plaintiff was also seen by Danny Minh-Tri Dang, a staff radiologist, and Joshua M. Ball, a resident physician, who performed a CT of the brain without contrast, and found no acute intracranial finding and mild to moderate sinus disease.  (Tr. 451.)  Dr. Downing noted that Plaintiff left against medical advice that same day.  (Tr. 466, 469.)

On October 21, 2008, Plaintiff saw Shala Asal, R.P.H., for pharmacy counseling. (Tr. 462-63.)

Plaintiff saw Dr. Snedden for a follow-up visit on November 3, 2008.  Plaintiff reported that he was still experiencing chronic severe pain below the knee joint, and that the knee joint had become unstable, resulting in an occasional fall.  Plaintiff requested a brace to assist his leg.  Dr. Snedden noted that Plaintiff continued to drink alcohol, occasionally heavily.  Dr. Snedden determined that Plaintiff needed a brace from prosthetics, and ordered a "PM & R consult" to fit him for a brace.  (Tr. 458-61.)

Dr. Snedden noted that Plaintiff failed to show up for appointments on November 18, 2008, and November 23, 2008.  (Tr. 453-55.)

On February 17, 2009, Dr. Snedden completed a Physical Medical Source Statement and Interrogatories on Plaintiff.  Dr. Snedden indicated that he had been treating Plaintiff since July 30, 2007 for "ESS HTN," GERD, depression and anxiety, chronic right leg pain, alcohol abuse, and a remote compound fracture in the right leg.

(Tr. 480.)  Dr. Snedden noted that, despite his impairments, Plaintiff could frequently lift and/or carry ten pounds, occasionally lift and/or carry 25 pounds, stand and/or walk for a total of three out of eight hours and continuously for thirty minutes to an hour, sit for a total of four out of eight hours and continuously for one hour, and push and/or pull twenty pounds or less with his right hand and thirty-five pounds or less with his left hand. Dr. Snedden also noted that Plaintiff could never climb, crouch or kneel, could occasionally balance or stoop, and could frequently bend.  Dr. Snedden noted that Plaintiff had no limitations in reaching, seeing, hearing, and speaking, but had a limited ability to handle, finger, and, with his right hand, feel.  Plaintiff also had environmental restrictions due to his right hand lacking a thumb.  Dr. Snedden noted that his statement took into account Plaintiff's pain, discomfort and other subjective complaints, and noted that rest would be helpful to Plaintiff.  In order to control his existing pain or fatigue, Dr. Snedden noted that Plaintiff needed to assume a reclining position for up to thirty minutes, one to three times a day, assume a supine position for up to thirty minutes, one to three times a day, and prop up his legs to a height of two to three feet while sitting, one to three times a day.  He also noted that if Plaintiff needed to recline or lie down to relieve pain, he would endorse that.  (Tr. 476-78, 481.)  Dr. Snedden's overall assessment was that Plaintiff could not sit or stand for uninterrupted periods greater than two hours, and that he could not "remotely approach" forty hours per week.  (Tr. 479.)  Additionally, he noted that Plaintiff was currently prescribed Oxycodone/Acetaminphen and Gabapentin, both of which could cause him to suffer from drowsiness.  (Tr. 481.)

**Evidentiary Hearing of December 18, 2008 (Tr. 5-39)**

Plaintiff, who was represented by counsel, testified that he was 43 years old, divorced, and had four daughters – ages 19, 11, nine and "7 or 8." The highest level of education he had achieved was one semester of college, and he had some military training as an aircraft electrician. He lived with his mother and brother, and because he could not drive long distances, his mother had driven him to the hearing. He had last worked in March of 2003 or 2004, at which time he worked as a lead technician for Textron Automotive in injection molding. At the time of the hearing, he was on long-term disability from work, and received approximately $2,400 per month in disability, $1,000 of which goes to child support.

In June 1996, Plaintiff was injured in an all-terrain vehicle ("ATV") accident. In that accident he injured his leg and also had part of his thumb amputated and rebuilt. He returned to work in December of 1996 and continued to work until 2003, when he testified the pain in his right knee, right hip, and right arm became so great that "he couldn't take the pain anymore."

Plaintiff also testified that he had a problem with alcohol, and at times drank between 12-18 beers daily. He had sought alcohol treatment several times, and did not want to "continue on drinking." His plan "would be to work." He also testified that he had never smoked and had not used marijuana since September 2007. However, he did use chewing tobacco. He testified that he took Percocet (in amounts the ALJ noted to be "copious"), heart medicine, nerve medicine, and blood pressure medicine, and that these medications made him "tired a lot," as well as nauseous.

Plaintiff testified that his treating doctor was at the VA. The last time he could remember having been there was August 2008, and possibly November 2008. He left the August 2008 visit against medical advice. He did not recall missing appointments on November 17 and November 23, 2008.

Plaintiff testified that he could no longer go hunting or fishing, and could no longer ride horses. He sometimes assisted his friends in taking care of cattle, but only by pulling a truck up for them to unload the hay.

Plaintiff testified that he was getting a custom-sized brace to support his right knee out of medical necessity, and on a "good day" he might be able to walk a mile before having to stop. He could sit 30 to 40 minutes at a time, but after that duration would start to fidget to get off of one side or the other and relieve the pressure. He also testified that he could lift between 10 and 15 pounds, and could drive short distances, but did not trust himself to drive long distances. He could microwave food for himself, but had problems dressing himself. He also experienced side effects from his pain medications, including vomiting, dizziness, and tiredness.

He testified that "a minimum of nine days . . . a month" he experienced intermittent sharp pain in his right hip, knee and foot "like someone is taking a needle . . . and jabbing it like in your foot." Plaintiff noted that on painful days he would "stand for a while, sit for a while, lie down, and, of course, take [his] medicine." He estimated that he would lie down for about three hours per day, including naps he would take when his medicine would make him drowsy. He additionally testified that the pain affected his mood by making him "grouchy," and interfered with his ability to interact with others.

The pain also affected his sleep most nights, adding to his drowsiness. Plaintiff testified that he still experienced significant pain and swelling in his leg, that he was able to alleviate to some degree by frequently switching positions. He testified that he had to put his legs up in the recliner for about 45 minutes about five to six times per day. In the past, Plaintiff saw mental health professionals and took mental health drugs, but was not currently doing so. He did testify that he drank to deal with the pain, even though his father died at age 42 of alcoholism.

A Vocational Expert ("VE") reviewed Plaintiff's work history, noting that Plaintiff was a plant supervisor, which is classified as light and skilled work in the national economy, although it could be classified as medium and skilled work as performed by Plaintiff. The VE testified that an individual with the Plaintiff's age, education level, past work experience, and who is limited to performing light exertional work, who can occasionally climb stairs and ramps, who can never climb ropes, ladders, and scaffolds, and who can occasionally balance, stoop, kneel, crouch and crawl, but is limited to only frequently (as opposed to constantly) reaching in all directions, including overhead, and should also avoid concentrated exposure to unprotected heights and vibration, could perform Plaintiff's past work as it is done in the national economy.

The VE then stated that an individual with all the abilities in the first hypothetical, and who is also limited to performing no more than simple tasks, "secetary [phoenetic] to alcohol dependence" could not perform Plaintiff's past work. However, the VE testified that an individual matching these characteristics would be able to perform jobs in the

regional and national economy, including information clerk, bench assembly, or furniture rental consultant.

The VE then testified that an individual with Plaintiff's age, education level, past work experience, and who is limited to performing sedentary exertion level work[5], who can occasionally climb stairs and ramps, who can never climb ropes, ladders, and scaffolds, and who can occasionally balance, stoop, kneel, crouch and crawl, but is limited to only frequently reaching in all directions including overhead on the right, and is limited to only frequent fingering and fine manipulation on the right, and should also avoid exposure to unprotected heights and vibration, could not perform Plaintiff's past work. However, the VE testified that such an individual would be able to perform jobs in the regional and national economy, including food and beverage clerk, charge account clerk, and surveillance system monitor.

The VE then stated that an individual with all of the abilities of the prior hypothetical, and whose job would have to allow for occasional unscheduled disruptions of both the workday and work week due to pain and the affects of medication as "necessity to take numerous long breaks" would not be able to find work in the regional or national economy.

_____

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); Social Security Ruling 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

Finally, the VE testified that an individual with Plaintiff's age and past work experience, and who was putting his legs up in a recliner or laying down for 45 minutes at a time due to swelling and pain in their right leg would not be able to work in the national economy.

## ALJ's Decision of June 2, 2009 (Tr. at 43-52.)

The ALJ held that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2008, and had not engaged in substantial gainful activity from his amended alleged onset date of September 21, 2004, through his last date insured. He then found that Plaintiff suffered from the following severe impairments: residuals of remote motor vehicle accident and a substance abuse disorder. He found, however, that neither of these impairments, singly or in combination, met or equaled an impairment listed in the Commissioner's regulations, 20 C.F.R. § 404, Pt. 404, Subpt. P, App. 1 ("Appendix 1"). He did note that Plaintiff's alcohol use was material to his disability.

The ALJ then proceeded to find that Plaintiff possessed the RFC to perform light work, except he could not climb ladders, ropes or scaffolds. He needed to avoid concentrated exposure to vibration, industrial hazards and unprotected heights. He could perform simple tasks only, due to his alcohol dependence. He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Lastly, he could frequently, not constantly, reach in all directions, including overhead, with his right arm. After considering the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of

these symptoms were not entirely credible. The ALJ noted that Plaintiff had returned to work a few months after the ATV accident and continued to work until 2003. While Plaintiff claimed to have left due to worsened pain, Plaintiff received little medical care. "As of his amended onset date in September 2004, [Plaintiff's] main problem . . . was his alcohol consumption," and there "was little evidence that [Plaintiff] was prevented from engaging in work-related activities due to his musculoskeletal problems."

The ALJ then noted that Plaintiff had unsuccessfully attempted to seek help for his alcohol addiction, and that Plaintiff's "alcohol consumption was intrinsically intertwined with his complaints of pain and depression." However, the ALJ noted that, because the ALJ's decision was unfavorable to Plaintiff, the alcoholism was not material to the determination of disability.

The ALJ discounted Dr. Snedden's medical source statement as unsupported by the medical evidence, because it did not acknowledge Plaintiff's non-compliance or substance abuse problems, other than mentioning that Plaintiff was being treated for alcohol abuse. Moreover, the ALJ noted that Plaintiff's general approach appeared to be a failure to cooperate, and the record contained a number of references to the Plaintiff leaving against medical advice. The ALJ, therefore, found that there was no evidence that Plaintiff was disabled prior to his date last insured of December 31, 2008.

Finally, the ALJ determined that, through the date last insured, Plaintiff was unable to perform his past relevant work. However, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. Therefore, Plaintiff was not disabled under

the Social Security Act at any time from September 21, 2004, the amended onset date, through December 31, 2008, the date last insured.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a

medically determinable impairment which has lasted or can be expected to last for not

less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-

22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R.

§ 404.1520, establishing a five-step sequential evaluation process to determine disability.

The Commissioner begins by deciding whether the claimant is engaged in substantial

gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the

claimant has a "severe" impairment or combination of impairments. A severe impairment

is one which significantly limits a person's physical or mental ability to do basic work

activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity

of mental disorders. This technique calls for rating the claimant's degree of limitations in

four areas of functioning: activities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments

that meets the duration requirement, the claim is denied. If the impairment is severe and

meets the duration requirement, the Commissioner determines at step three whether the

claimant's impairment meets or is equal to one of the impairments listed in the

Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so, the claimant is

conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four

whether the claimant has the residual functional capacity to perform his past relevant

work, if any. If the claimant can return to past relevant work, the claimant is not

disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to

demonstrate that the claimant has the RFC to perform a significant number of other jobs

in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert as to the availability of jobs that a person with the claimant's profile could perform. Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**The ALJ Properly Disregarded Dr. Stansfield's June 16, 2004 Opinion.**

Plaintiff argues that the ALJ erred in disregarding the July 16, 2004 opinion of Dr. Stansfield, found at page 346 of the transcript. Plaintiff argues that Dr. Stansfield's opinion is inconsistent with the ALJ's determination of Plaintiff's RFC, and because the ALJ did not even comment on this opinion, it is impossible to determine the weight the ALJ gave to Dr. Stansfield's opinion.

The ALJ began his decision by noting that Plaintiff's previous application for disability insurance benefits was denied on September 20, 2004, and review was denied by the Appeals Council of the Social Security Administration on January 13, 2005.

Finding that there was no basis for reopening Plaintiff's prior application, the ALJ found that application to be administratively final and res judicata.

The Commissioner's regulations provide that an application is effective through the date of the ALJ's decision. 20 C.F.R. § 404.620. Therefore, the ALJ held that any reference to evidence pertaining to the period prior to September 21, 2004 was only for background, and should not be construed as reopening the prior final decision. (Tr. 43.) Because the ALJ expressly stated that he was not reopening the earlier application, there was no constructive reopening of the prior case. See e.g. Hardy v. Chater, 64 F.3d 405, 407 (8th Cir.1995) (no de facto reopening of prior determination where the ALJ expressly stated he was not reopening the earlier decision and then made an independent finding concerning a different disability period based upon a different administrative record); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 (8th Cir. 1993) ("the mere allowance of evidence from the earlier applications, without more, cannot be considered a reopening of the earlier case"); Robertson v. Sullivan, 979 F.2d 623, 625 (8th Cir.1992) (review of claimant's medical history does not constitute reopening on the merits of an earlier application). Accordingly, the ALJ did not need to evaluate the opinion of Dr. Stansfield issued prior to September 20, 2004, and did not err by failing to do so.

**The ALJ Properly Discounted Dr. Snedden's February 17, 2009 Opinion.**

Plaintiff also argues that the ALJ erred in discounting the Medical Source Statement and Interrogatories completed by Dr. Snedden on February 17, 2009, found at pages 476 to 481 of the transcript. Plaintiff argues that Dr. Snedden's opinion in these documents is inconsistent with the ALJ's determination of Plaintiff's RFC and would

indicate that Plaintiff would not be able to work on a "regular and continuing basis" eight hours a day for five days a week, as required by Social Security Ruling 96-8(p).

In his decision, the ALJ states that he discounted Dr. Snedden's opinion because he found Dr. Snedden's Medical Source Statement to be unsupported by the medical evidence and because Dr. Snedden "did not acknowledge the claimant's noncompliance or substance abuse problems, other than mentioning the claimant was being treated for alcohol abuse." (Tr. 50.)

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). See also Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a physician's opinion was not entitled to controlling weight as a treating physician opinion because the physician had only seen the claimant on three prior occasions). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). See also Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).

The Court finds that substantial evidence exists in the record to support the finding that Dr. Snedden's opinion was not entitled to controlling weight. Dr. Snedden did not qualify as a treating physician under 20 C.F.R. § 404.1527. The record indicates that

while Dr. Snedden stated that he had been treating Plaintiff for his medical problems since July 30, 2007, Dr. Snedden had only seen Plaintiff twice, on December 20, 2007 and November 3, 2008. (Tr. 453-55, 458-61, 469-73.) As such, the ALJ need not give Dr. Snedden's opinion controlling weight.

Moreover, there is substantial evidence in the record indicating that Dr. Snedden's treatment was based largely on Plaintiff's subjective complaints, rather than on objective medical evidence. Plaintiff reported that his pain was a 7 on a 10-point pain scale, and Dr. Snedden noted that Plaintiff was in "some pain." (Tr. 469-70.) Plaintiff requested a knee brace, and Dr. Snedden ordered it. (Tr. 458, 461.) Dr. Snedden's treatment notes do not reflect his taking any measurements, or collecting any other evidence, to support his opinions provided in the Medical Source Statement regarding Plaintiff's ability to walk, sit, or stand. (Tr. 458-61, 469-73, 476-79.) An ALJ may give less weight to a physician's opinion when it is based largely on the claimant's subjective complaints, rather than on objective medical evidence. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).

Lastly, Plaintiff argues that the ALJ's statement disregarding Dr. Snedden's opinion because Dr. Snedden "did not acknowledge the claimant's noncompliance or substance abuse problems, other than mentioning the claimant was being treated for alcohol abuse" was inconsistent with the ALJ's earlier statement that "even Dr. Snedden noted in his Medical Source Statement that the claimant was being treated for alcohol abuse." (Tr. 50.) Plaintiff's argument is misplaced because the ALJ acknowledged that Dr. Snedden noted Plaintiff's treatment for alcohol abuse. Moreover, nowhere in his

treatment notes did Dr. Snedden indicate Plaintiff's noncompliance with treatment, or the effect his continuing addition may have on his impairments. (Tr. 476-79.) Accordingly, the Court finds substantial evidence in the record from which the ALJ could determine that Dr. Snedden failed to account for Plaintiff's noncompliance with treatment, and the ALJ did not err in considering Dr. Snedden's failure to do so. See Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008).

The Court therefore finds that there was substantial evidence on the record as a whole to support the ALJ's determination that Dr. Snedden's opinion was unsupported by the medical evidence and failed to acknowledge Plaintiff's noncompliance with treatment. The ALJ did not err in discounting Dr. Snedden's opinion.

**The ALJ Erred in Determining Plaintiff's RFC.**

Plaintiff argues that, in disregarding the two medical opinions discussed above, the ALJ improperly made his RFC finding without citing to any specific medical evidence to support that finding.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an

individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

"Some medical evidence is necessary to support the ALJ's determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotations omitted). Here, the ALJ improperly substituted his own lay opinion for the opinions of treating or examining professionals. See Id. at 703; see also Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000) ("[a]n administrative law judge may not draw upon his own inferences from medical reports"); Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir. 1974) (same). As such, the ALJ's opinion cannot be affirmed.

Because Dr. Stansfield and Dr. Snedden were the only medical sources to report on plaintiff's impairments, disregarding their opinions left no medical evidence on the issue. Under the circumstances, it was reversible error for the ALJ to substitute his own conclusions for those of plaintiff's physicians. See DiMasse, 2004 WL 133928. *3 (8th Cir. Jan. 22, 2004); Shontos, 328 F.3d at 427; Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) (per curiam).

The Court also notes that the ALJ dealt with Plaintiff's alcohol use in a very summary fashion, stating only that "[S]ince this decision is unfavorable to the claimant, alcoholism is not material to the determination of disability." (Tr. 50.) In 1996, the Social Security Act was amended to reflect changes in the award of benefits related to substance abuse. The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction

would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). <u>See also</u> <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 693 (8th Cir. 2003). 20 C.F.R. § 404.1535(b) details how the Commissioner is to evaluate if substance abuse is material in determining disability. Should the ALJ determine that Plaintiff is disabled on remand, the ALJ may need to provide a more extensive analysis of how Plaintiff's alcohol use affects his disability.

## **CONCLUSION**

The Court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ should be directed to fully develop the record in a manner consistent with this court's opinion, redetermine Plaintiff's residual functional capacity, make any other relevant findings, and redetermine whether or not Plaintiff is disabled under the Social Security Act. The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commissioner should return a finding of "disabled." The court is merely concerned that the Commissioner's final determination that Plaintiff is not disabled, as it currently stands, does not comply with the Regulations and case law. As such, it cannot be said that the record is supported by substantial evidence in this regard.

Accordingly,

**IT IS HEREBY ORDERED** that this case is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order**.**


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE


Dated this 21st day of March, 2011.